UNITED STATES of America,
Plaintiff,

v.

AIRCO, INC., Defendant.

No. 72 Civ. 265.

United States District Court,
S. D. New York.

Dec. 30, 1974.

Irene A. Bowman, Lewis Bernstein, Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Shearman & Sterling, New York City, for defendant; W. Foster Wollen, Clarence W. Olmstead, Jr., New York City, of counsel.

## OPINION

BONSAL, District Judge.

The United States commenced this action against defendant Airco, Inc. ("Airco") on January 20, 1972 to prevent and restrain alleged continuing violations by Airco of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Jurisdiction is predicated on section 4 of the Sherman Act, 15 U.S.C. § 4.

Airco, formerly known as the Air Reduction Company, Inc. is a diversified manufacturing company incorporated under the laws of New York. In 1972, the products which Airco produced and sold were within two major groups: (i) metallurgical and (ii) gases and related equipment. Products of the metallurgical group include ferroalloys, carbon, graphite, electrodes, and metal. The major products of the gases and related equipment group are industrial gases, cryogenic equipment, welding and cutting equipment, and medical gases and equipment. Of Airco's sales of approximately $518 million in 1972, products of the metallurgical group accounted for 42.6% and products of the gases and related equipment group accounted for 57.4%. In 1972 Airco ranked 255th in

sales on Fortune's Directory of the 500 largest United States industrial corporations and had assets of some $607 million.

The complaint charges that since at least as early as 1959, and continuing to the date on which the complaint was filed, Airco violated section 1 of the Sherman Act "by entering into combinations involving reciprocal purchasing arrangements with respect to a substantial amount of interstate commerce whereby the defendant purchased products and services sold by various suppliers upon the understanding that those suppliers would purchase the products and services of the defendant, in unreasonable restraint of the aforesaid trade and commerce." In addition, the complaint charges that during this same period of time Airco, "through the use of its purchasing power," violated section 2 of the Sherman Act "by attempting to monopolize that part of the aforementioned interstate trade and commerce consisting of the requirements of actual and potential suppliers of the defendant for ferroalloys, industrial gases and other products sold by the defendant." The action was tried by the Court without a jury on July 11 and 12, 1974. After completion of the government's case, Airco moved pursuant to F.R.Civ.P. 41(b) for a dismissal on the ground that upon the facts and the law the government has shown no right to relief. Under F.R.Civ.P. 41(b) this Court has the power to decide the case on the merits and, unlike in a jury case, need not consider the government's evidence in a light most favorable to the government. 5 J. Moore, Federal Practice ¶ 41.13[3], at 1155 (2d ed. 1974). *See also* Huber v. American President Lines, 240 F.2d 778, 779 (2d Cir. 1957). However, in reaching the decision hereinafter set forth, the Court has interpreted the evidence in a light most favorable to the government.

*Section 1 of the Sherman Act*

The government contends that Airco violated section 1 of the Sherman Act by entering into combinations with its suppliers involving reciprocal buying. Simply defined, reciprocal buying is the practice of if you buy from me, I will buy from you, or conversely, if you don't buy from me, I won't buy from you. *See* United States v. General Dynamics Corp., 258 F.Supp. 36, 57 (S.D.N.Y. 1966). Whether accomplished by coercion or by more subtle arrangements, reciprocal buying has been recognized by the Supreme Court as "one of the congeries of anticompetitive practices at which the antitrust laws are aimed. The practice results in 'an irrelevant and alien factor,' . . . intruding into the choice among competing products, creating at the least 'a priority on the business at equal prices.'" Federal Trade Commission v. Consolidated Foods Corp., 380 U.S. 592, 594, 85 S.Ct. 1220, 1221, 14 L.Ed.2d 95 (1965). Among the consequences of reciprocal buying is the foreclosure of markets to competitors through use of purchasing power.

Courts have most frequently confronted reciprocal buying as an anticompetitive practice in the context of conglomerate mergers challenged under section 7 of the Clayton Act, 15 U.S.C. § 18. *See* Federal Trade Commission v. Consolidated Foods Corp., *supra;* Allis-Chalmers Manufacturing Co. v. White Consolidated Industries, Inc., 414 F.2d 506 (3d Cir. 1969), cert. denied, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); United States v. Ingersoll-Rand Co., 320 F.2d 509 (3d Cir. 1963), affirming 218 F.Supp. 530 (W.D.Pa. 1963). The leading case on reciprocal buying as a violation of section 1 of the Sherman Act is United States v. General Dynamics Corp., *supra.*

The *General Dynamics* case arose out of a merger between General Dynamics Corporation and Liquid Carbonic Corporation, which resulted in Liquid Carbonic's becoming a division of General Dynamics. Finding that the merger created a potential for reciprocal buying which had been actively exploited to benefit the sales of the Liquid Car-

bonic division and that at the time of the merger both General Dynamics and Liquid Carbonic had the intent to employ reciprocity to generate sales, the Court held that the merger violated section 7 of the Clayton Act and section 1 of the Sherman Act. However, although the Court found the presence of contracts for the sale of Liquid Carbonic's products to suppliers of General Dynamics, which were predicated on reciprocal buying, it held that a violation of section 1 of the Sherman Act by reason of the actual practice of reciprocal buying had not been established because the government had failed to prove that a not insubstantial amount of commerce was affected.

In analyzing reciprocal buying as a violation of section 1 of the Sherman Act, the Court in *General Dynamics* drew an analogy with tying arrangements and focused on "specific contracts or combinations between the defendant's Liquid Carbonic Division and vendors of General Dynamics which were consummated as a result of" reciprocity. 258 F.Supp. at 51. The government had argued that if reciprocity was systematically interjected into the sales of the Liquid Carbonic division, and statistics and statements of the defendant indicated that the program was effective, then the Court could infer the existence of contracts in restraint of trade. The Court's answer is quoted at length:

"Such a conclusion is not warranted. The Section's reference to contracts, combinations and conspiracies, is necessarily directed at bilateral arrangements. The statistics which the government mentions have been found by the court to be credible. Nonetheless, the business secured could be the result of the mere presence of the reciprocity power. United States v. Ingersoll-Rand Co., 320 F.2d 509, 524 (3d Cir. 1963). Vendors of General Dynamics to curry favor or protect present sales to the defendant, might unilaterally decide to purchase the products of Liquid Carbonic. In such

instances, no actual contacts would occur and thus no agreements would be present to serve as a predicate for a Sherman § 1 violation. This is true even though if a sufficient volume of trade was diverted in this fashion, a Clayton § 7 violation would be established.

"To prove the presence of vendor contracts on condition, particular contracts with identifiable parties must be introduced into evidence, or legitimately inferred from the conduct of such identifiable parties."
258 F.Supp. at 66.

With these guidelines in mind, the Court turns to an examination of the evidence to determine whether the government has shown that Airco entered into any contracts, combinations, or conspiracies, or otherwise engaged in any course of dealing with any of its suppliers involving reciprocal buying, and whether if it did, a not insubstantial amount of interstate commerce was affected. The evidence consists of the trial testimony of five witnesses, some 250 exhibits, and selected portions of depositions taken from 15 officers and employees of Airco.

The central figure in Airco's alleged reciprocal buying practices was Herman Van Fleet, Jr., the son of one of Airco's founders. From 1958 to 1962, Van Fleet held the position of Divisional Manager of National Accounts and Trade Relations for Airco's Industrial Gases Division. During the period 1962 to 1972, Van Fleet was Manager of Commercial Relations. Airco's Commercial Relations Department was composed of Van Fleet, his assistant, Fred Downs, and a secretary.

In his capacity as Manager of Commercial Relations, Van Fleet was concerned primarily with trade relations, which involved (1) assisting Airco sales personnel seeking to present sales proposals to other companies in meeting the personnel in such companies who were responsible for making purchasing decisions, and (2) assisting sales repre-

sentatives from other companies seeking to present sales proposals to Airco in meeting Airco personnel who were responsible for making purchasing decisions. In a job description which he prepared in 1967, Van Fleet described his responsibility as Manager of Commercial Relations as "providing necessary intelligence and guidance for proper coordination of divisional selling effort." (Plaintiff's Exhibit ("PX") 187.) Among his functions, as he understood them, were to:

"1. Create with companies with which we do business a favorable atmosphere which will assist the direct selling efforts of the Division Marketing organizations, and develop, maintain and improve relations with present and potential customers.

2. Maintain for use of company personnel information records about the company's business contacts in respect to:

    a. Purchases

    b. Sales

    c. Products

    d. Financial Position

    e. Organization, facilities and connections

3. Make commercial recommendations to assist Airco Purchasing Department.

4. Arrange introductions between customers' and suppliers' personnel and the proper people in our Company to accomplish best possible relationships.

5. Develop and maintain relationship with Commercial or Trade Relations Managers of key customers and suppliers.

6. Prepare and distribute to Management reports of major purchases and sales by Divisions on regular basis.

7. Keep abreast of important sales and purchase activities and act as the liaison agent between our Central Purchasing Department and the various Divisional Marketing or Sales Departments.

8. Engage personally in direct sales activity with Head Office or field personnel when requested.

9. Obtain up-to-date intelligence to aid in sales work in connection with customers and suppliers concerning mergers, acquisitions, expansions, personnel changes etc. and advise proper division or department."

In performing his job, Van Fleet came into frequent contact with trade relations personnel of other companies, including customers and suppliers of Airco. Airco's Commercial Relations Department was discontinued in April or May 1972.

With the approval of Airco, Van Fleet was a member of the Trade Relations Association, Inc. from its inception in 1962 until it became inactive in late 1971 or early 1972. The Trade Relations Association was made up of personnel from various companies who, like Van Fleet, were involved in trade relations. According to Van Fleet, the Trade Relations Association was concerned with the proper development of the trade relations function and gave him an opportunity to meet people who were interested in the same function as he was. Van Fleet attended the meetings of the Trade Relations Association regularly, became a director in 1968 and was president from 1970 until the Trade Relations Association became inactive. Airco paid Van Fleet's membership fee in the Trade Relations Association and his expenses when he attended as a member representing Airco.

During the period of approximately 1965 through 1971, Airco made computer printouts listing the purchase and sales transactions between the Airco divisions and Airco's major customers and suppliers. Copies of these printouts were kept in Van Fleet's office and at least until 1967 were distributed to certain Airco personnel, including the division presidents and the director of purchasing. The computer printouts were discontinued in 1971 or 1972.

Van Fleet would on request or on his own · initiative provide purchase and sales information to Airco personnel with purchasing and selling responsibilities. On his own business trips Van Fleet generally took with him purchase and sales information relating to companies which he planned to visit. One Airco officer testified at his deposition that he found purchase and sales information useful in evaluating potential antitrust problems in merger or acquisition discussions. (Reich deposition at 18.) Such information was also a means for Airco officers, who had frequent contact with officers of Airco's customers and suppliers, to acquire knowledge about the general scope of activities between Airco and its customers and suppliers.

Airco's stated purchasing policy was to purchase on the basis of price, quality, and service. In 1967, Airco's purchasing personnel were told by the then Vice-President—Administration that "in proper circumstances" Airco's purchases could be used as part of the effort "to obtain a chance to present our sales pitch when necessary to assist marketing activities," and that where price, quality, and service were equal "consideration may be given to Airco's actual and potential sales to an otherwise equal supplier." (PX 160, at 14.) In the late 1960s Airco's purchasing activities were transferred from a centralized purchasing department to the divisional units of the corporation.

Van Fleet was on occasion asked by purchasing personnel for recommendations as to suppliers. He recommended that where price, quality, and service were equal, customers should be preferred.

To show that Airco entered into contracts, combinations or conspiracies with its suppliers involving reciprocal buying and that a not insubstantial amount of trade was affected, the government introduced evidence on Airco's relationships with four steel companies, and with FMC Corporation, Cosmodyne Corporation, National Distillers and Chemical Corporation, and Allied Chemical Corporation.

As a group, steel companies are Airco's largest customers. In 1968 Airco's ten largest steel mill customers accounted for 16.5% of Airco's total sales revenue, and in 1969 this figure rose to over 18%. (PX 184.) Among the products which Airco sells to steel companies are oxygen, graphite, ferroalloys, and welding and cutting equipment. In addition, the steel companies are among Airco's largest suppliers. From them, Airco purchases its steel requirements for welding electrodes and arcrods plants.

The evidence indicates that Van Fleet and other Airco personnel had frequent contacts with representatives of various steel companies. During the years 1965 through 1971, Van Fleet was responsible for organizing and hosting an entertainment suite of rooms to receive and to talk to Airco's steel company customers and suppliers when the American Iron and Steel Institute held its annual convention in New York. Information as to Airco's purchases from and sales to steel companies was made available to certain Airco officers prior to their contacts with executives of Airco's steel company suppliers. In addition, Van Fleet assisted some of Airco's steel company customers in attempting to meet Airco's steel wire specifications.

On February 27, 1968 John Keeney, then Airco's Corporate Director of National Accounts, announced that Airco "has embarked on an additional selling effort" with regard to steel mills and foundries. Keeney's primary objective was "to try to convince the Steel Industry that Airco should be their principal source of supply for Industrial Gases, Ferro Alloys and Metals, Carbon and Graphite Electrodes and Welding Products." Keeney stated that his own activities "will be more directed to helping them accomplish their goals by image building—opening doors—paving the way, etc. Call it what you will. To accomplish this will involve, among other things, the establishment and nurturing of the proper relationships with

the steel company management personnel concerned." (PX 183.)

At his deposition, Van Fleet testified that although he did not participate in the additional selling effort, he did provide Keeney with information as to Airco's purchases from and sales to the steel industry. (Van Fleet Deposition, at 252–253.) Van Fleet also provided this information to certain division personnel.

On April 30, 1968 Van Fleet and Keeney called on Dick Thompson, Vice President—Purchases for National Steel in Pittsburgh, and Herbert Hock, Manager—Trade Relations. (PX 29.) During 1968 and subsequent to Keeney's announcement of the additional selling effort, Van Fleet had five business contacts with his trade relations counterpart at Interlake Steel Corporation, six business contacts with his counterparts at Republic Steel Corporation, two business contacts with his counterpart at United States Steel Corporation, and at least one contact each with his counterparts at Armco Steel Corporation, National Steel Corporation, and Allegheny Ludlum Steel Corporation.

In a memorandum dated November 7, 1968, Van Fleet sent T. H. Tabb, purchasing agent for the Airco Welding Products Division, suggested "guidelines" for purchases of steel products. (PX 189.) At his deposition, Tabb testified that to the best of his recollection he did nothing with Van Fleet's memorandum and did not know the reason for Van Fleet's suggested percentages. (Tabb Deposition, at 220–222.) He also stated that business was not awarded on the basis of the percentages suggested in Van Fleet's memorandum. (Tabb Deposition, at 229.)

By memorandum of March 20, 1970 (PX 184), Keeney announced that "[m]aterial improvement over 1968 was made in [Airco's] sales to:

a. National Steel Corp.—+80%
b. Allegheny Ludlum Steel—+74.0%
c. Jessop Steel—+40.0%
d. U. S. Steel—+33.0%"

In 1968 Airco had the following purchases from and sales to these four steel companies (PX 186):

| | Purchases | Sales |
|---|---|---|
| National | $ 61,000 | $ 2,300,000 |
| Allegheny Ludlum | 138,000 | 5,300,000 |
| Jessop | 250,000 | 1,700,000 |
| U. S. Steel | 3,612,000 | 15,300,000 |

The government has not introduced into evidence any specific purchase or sale contracts between Airco and any steel companies. In view of the 1968 trade balances between Airco and the four above-mentioned steel companies, it would not appear that Airco was in a position to force reciprocal buying on any of them. Therefore, if reciprocal buying did occur, it would probably have had to have been by mutual agreement. The government has not introduced any testimony of any personnel from the steel companies, other than that of Edward Backes, who retired from United States Steel Company in June 1967 and who testified generally about his former trade relations functions at United States Steel and about the Trade Relations Association. Having considered that evidence which has been presented, the Court finds no reasonable basis on which to conclude that all or any part of the increase in Airco's sales to the four steel companies mentioned in Keeney's memorandum of March 20, 1970 resulted from reciprocal buying. The Court finds that the government has not shown that Airco entered into any contract, combination, or conspiracy, or otherwise engaged in any course of dealing with any steel company involving reciprocal buying.

During the period 1964 through 1969, Airco's purchases from and sales to FMC Corporation were as follows (PX 23, 242):

| | Purchases | Sales |
|---|---|---|
| 1964 | $311,000 | $153,000 |
| 1965 | 239,000 | 310,000 |
| 1966 | 195,000 | 520,000 |
| 1967 | 519,000 | 372,000 |
| 1968 | 277,000 | 497,000 |
| 1969 | 434,000 | 515,000 |

On March 1, 1968 Van Fleet met with Don Oskin, Executive Vice President,

and Raymond C. Tower, Executive Vice President—Chemical Corporation of FMC Corporation. On or about May 9, 1968 Van Fleet furnished George Dillon, then Airco's President, a list showing a breakdown of Airco's purchases from and sales to FMC for the year 1967 and totals for the years 1964 to 1966. (PX 23.) In a covering memorandum, Van Fleet pointed out to Dillon that "the potentials for Industrial Gases, Welding Products and Graphite Products are very large indeed. We have never enjoyed our share." (PX 23.) During the week of July 22, 1968, Van Fleet made a trip to the West Coast to work with both the Industrial Gases and the Welding Products Division. (PX 106.) In his monthly activity report dated August 20, 1968, Van Fleet reported that "[o]ur trip to the West Coast during the week of July 22, was successful. The accounts handled were . . . FMC Corporation . . . ." (PX 105.)

The government contends that in 1968 FMC Corporation increased its purchases of industrial gases and other products from Airco to retain its sales to Airco. To substantiate this contention, the government points out that in 1967 Airco's total purchases from FMC were greater than FMC's total purchases from Airco; that in 1968 Airco decreased its purchases from FMC Corporation by $242,000 as compared to 1967; and that in 1968 FMC increased its purchases from Airco by $125,000 over 1967 purchases. No testimony of any FMC personnel was introduced to explain the reason for FMC's increased purchases in 1968. Aside from the fact that fluctuations in annual purchase and sales figures are by themselves of little probative value on the issue of reciprocal buying, there is evidence which vitiates the government's contention. In his memorandum to Dillon of May 9, 1968, Van Fleet pointed out that $252,000 of Airco's purchases from FMC in 1967 was accounted for by "a one-shot purchase" of conveying equipment. (PX 23.) If this extraordinary item is excluded from Airco's 1967 purchases from FMC, then Airco's 1968

purchases from FMC could be interpreted as representing a slight increase in purchases rather than a decrease. The Court finds that the government has failed to show that Airco entered into any contract, combination, or conspiracy, or otherwise engaged in any course of dealing with FMC Corporation involving reciprocal buying.

During the period 1966 through 1969, Airco's purchases from and sales to Cosmodyne Corporation were as follows (PX 242):

|      | Purchases   | Sales    |
| ---- | ----------- | -------- |
| 1966 | $1,270,000  | $61,000  |
| 1967 | 912,000     | 27,000   |
| 1968 | 1,046,000   | 53,000   |
| 1969 | 755,000     | 79,000   |

On June 27, 1967 Lorrin C. Tarlton, Jr., who was a sales manager for Cosmodyne, sent a telex to the Louisville, Kentucky Manufacturing Division of Cosmodyne which stated:

"Need answer in one hour—How much business placed with Airco this year. General ballpark numbers. National Reciprocity Manager due here in one hour. Please advise."

(PX 239.)

In reply, Tarlton was told:

"Airco business this year $5,464 January L [sic] to present."

(PX 239.)

Tarlton testified at trial that his reference to a "National Reciprocity Manager" was a "facetious, somewhat sarcastic reference to a non-function, used in the context of a daily friend-to-friend business relationship with Mr. Heath," (Transcript, at 46) who at that time was division manager of Cosmodyne's Louisville, Kentucky Manufacturing Division. He also testified that the phrase "National Reciprocity Manager" was used in the context of the concern of trade relations managers from Airco and other companies "about getting a reasonable opportunity to bid for our purchases of liquid nitrogen, welding gases, welding rods and other welding equipment." (Transcript, at 49.) According to Tarlton, Cosmodyne's purchases from the customer group in which Airco was classi-

fied were in the range of $100,000 to $200,000 a year while sales to this customer group were in the range of $6,000,000 to $12,000,000 a year. (Transcript, at 48.)

On or about March 5, 1968 Van Fleet furnished to Dillon information with respect to Airco's sales to and purchases from Cosmodyne Corporation. (PX 182.) Van Fleet testified at his deposition that he recalled furnishing the information to Dillon in preparation for a west coast business trip by Dillon in which Dillon expected to contact Cosmodyne. Van Fleet's purpose in preparing this information was "to completely brief Mr. Dillon on Airco's affairs with the companies involved." (Van Fleet Deposition, at 263.) At his deposition, Dillon testified that he had no recollection of having asked Van Fleet for any information prior to his west coast trip in 1968 or of having received information with respect to Airco's purchases from and sales to Cosmodyne. (Dillon Transcript, at 72.)

During Dillon's trip to the west coast in 1968, he and Charles Simpson, then Airco's West Coast Industrial Gas Manager, talked with both Cosmodyne's Chairman and its President. Dillon expressed to the Cosmodyne officers Airco's interest in selling Cosmodyne oxygen and nitrogen. Dillon testified at his deposition that to the best of his recollection the subject of Airco's purchases from and sales to Cosmodyne did not come up in the conversation. Dillon further testified that he did not recall any sale being made to Cosmodyne at this time, but that he did recall that Cosmodyne had a contract which prevented Airco from making an immediate sale. (Dillon Deposition, at 73–75.)

■ ■ Although Tarlton's telex of June 27, 1967 indicates that Tarlton believed it necessary to know Cosmodyne's purchases from Airco in preparation for a meeting with an Airco trade relations representative, the telex alone is insufficient to support a finding by this Court that Airco and Cosmodyne entered into any course of dealing involving reciprocal buying. The government has not introduced into evidence any specific contracts between Airco and Cosmodyne which may be said to manifest such a course of dealing. Tarlton testified that he had only cursory information about Cosmodyne's purchases from customers (Transcript, at 51), and no other officers or employees of Cosmodyne were called to testify about the fluctuations in Cosmodyne's annual purchases from Airco. Moreover, even if the Court could infer from the scant evidence presented that Airco and Cosmodyne did enter into a course of dealing involving reciprocal buying, there is no basis on which the Court could find that a not insubstantial amount of interstate commerce was affected. It would be unreasonable to assume that a not insubstantial amount of commerce was affected simply because Airco's sales to Cosmodyne increased substantially in 1968. As the Court held in United States v. General Dynamics Corp., *supra,* more definite proof is required. The Court finds that the government has failed to show that Airco entered into any contract, combination, or conspiracy, or otherwise engaged in any course of dealing with Cosmodyne involving reciprocal buying and that a not insubstantial amount of interstate commerce was affected.

■ In 1970 and 1971, Airco's purchases from and sales to National Distillers and Chemical Corporation were as follows (PX 242):

|      | Purchases | Sales     |
|------|-----------|-----------|
| 1970 | $855,000  | $288,000  |
| 1971 | 537,000   | 178,000   |

On January 15, 1970, Van Fleet was notified by R. J. Ehlers, AIG-Pacific, that Almaden Vineyards, a division of National Distillers, was cancelling its carbon dioxide contract with Liquid Carbonic Corporation and that Airco had been invited to quote on it. Ehlers indicated that the sales representative, R. D. Switzer, would appreciate Van Fleet advising him whether Airco was purchasing any product from National

Distillers. By letter of January 26, 1970, Van Fleet replied:

"It is true that we have substantial relationships with National Distillers through the Bridgeport Brass Division and the U. S. Industrial Chemicals Division. However, any attempt to make this fact known at Almaden, I think, would be wrong and could only lead to misunderstandings. I hasten to reiterate that our Company policy is not to use any leverage in such a way.

"If you will give me more information, it would be appropriate for me at the right time to talk to my counterpart at the headquarters of National Distillers. We are good friends of theirs and if you are competitive we could use these relationships in the right way." (PX 26.)

R. W. Gibson, AIG-Pacific, replied to Van Fleet's letter of January 26. Gibson informed Van Fleet of his desire to obtain the bulk carbon dioxide business at Almaden Vineyards, which amounted to approximately 600,000 pounds a year. However, Gibson noted that Almaden would not realize any substantial savings by switching to Airco because Airco would have to quote the same scheduled price as Liquid Carbonic. Gibson stated that "the only way in which we will be able to secure the business would be through creating a desire on the customer's part to want to do business with AIG." Gibson further wrote to Van Fleet, "Anything that you can do to assist us in creating this desire will be sincerely appreciated." (PX 27.)

Van Fleet contacted Robert E. Hennessy, National Distillers' Vice President of Purchases, on February 17, 1970. Van Fleet had known Hennessy for some time through the Trade Relations Association. On February 19, 1970 Van Fleet met with Hennessy and discussed Airco's desire to gain the San Jose bulk carbon dioxide business at Almaden Vineyards. By memorandum of February 20, 1970, Van Fleet reported to Gibson that the purchasing decision would be made by Mr. Morrison, the local purchasing agent, but that Van Fleet had a "distinct feeling that Mr. Hennessy will put in a good word for us with Mr. Morrison." In addition, Van Fleet reported that he expected that if there were any difficulties with Airco's sales proposal, Hennessy would advise Van Fleet in time for Airco to correct them. (PX 28.)

Almaden Vineyards entered into a Sales and/or Rental Agreement with Airco dated March 18, 1970 to purchase 600,000 pounds of carbon dioxide and issued a purchase order to Airco dated March 24, 1970. The purchase order indicated that Airco would provide Almaden with a 12 ton receiver and would supervise its installation. In 1971 the purchase order was renewed by Almaden Vineyards with a slight increase in price for the carbon dioxide. Airco's sales of bulk carbon dioxide to Almaden Vineyards in 1970 and 1971 amounted to $15,475.10 and $18,439.65, respectively. (PX 230, 245; Transcript, at 166–167.)

The government apparently asks the Court to draw from the evidence the inference that Van Fleet went to Hennessy and obtained the Almaden Vineyards account by use of reciprocal buying pressures. However, there is no evidence that Van Fleet interjected reciprocity considerations into his contact with Hennessy on February 17, 1970, or at their meeting on February 19, 1970. No one from National Distillers or Almaden Vineyards was called to testify as to the reasons why Almaden Vineyards decided to purchase carbon dioxide from Airco in 1970 and 1971. One factor may have been Airco's willingness to supply Almaden Vineyards with a 12 ton receiver and supervise its installation, which Liquid Carbonic was apparently unwilling or unable to do. On the basis of the evidence presented, the Court finds that the government has not shown that Airco entered into any contract, combination, or conspiracy, or otherwise engaged in any course of dealing with National Distillers involving reciprocal buying.

For the years 1967 through 1971 Airco had the following purchases from and sales to Allied Chemical Corporation (PX 242):

|  | Purchases | Sales |
|------|-----------|-------|
| 1967 | $1,220,000 | $ 519,000 |
| 1968 | 1,153,000 | 855,000 |
| 1969 | 995,000 | 1,051,000 |
| 1970 | 1,277,000 | 1,018,000 |
| 1971 | 1,253,000 | 1,056,000 |

On October 15, 1968, Van Fleet had a contact with Dillon on the subject of Allied Chemical Corporation. (PX 81.) In a "Memorandum to File" dated November 1, 1968, Van Fleet noted that Allied Chemical was "a target account with George Dillon because of his relationship with John Conner, President." Van Fleet pointed out that there was additional sales potential for Airco in vinyl acetate monomer and annodes, and that Airco's major purchases from Allied were pitch, raw carbon dioxide, coke, acetone, and other chemicals. Van Fleet closed the memorandum by noting that "Mr. Dillon feels that his relationship with Conner is such that unless the potential are very large and very active, he would not like to use that avenue of support." (PX 17.) On November 17, 1969, Van Fleet had lunch with F. Emmerick, who is listed on Van Fleet's Expense Report as Manager of Trade Relations for Allied Chemical. (PX 242.)

■ As pointed out earlier, fluctuations in annual purchases and sales figures are by themselves of little probative value on the issue of reciprocal buying. The additional evidence introduced by the government is insufficient to support a finding by the Court that Airco entered into any contract, combination, or conspiracy, or otherwise engaged in any course of dealing with Allied Chemical involving reciprocal buying.

In addition to the evidence reviewed above, the government introduced the testimony of Leland S. Triplett, who in 1969 was a traffic agent for the Union Pacific Railroad, working in Cleveland, Ohio, and the testimony of William B. May, who in 1961 was a freight traffic agent for the Union Pacific, working in New York City. Triplett testified that his duties included selling or soliciting freight transportation for the Union Pacific and that among the prospective customers which he visited was Airco's Arcrods Plant in Cleveland. Triplett further testified that sometime between April 9, 1969 and June 2, 1969 he visited the Arcrods Plant and spoke to Miss Golden, traffic manager of the Arcrods Plant, who told him what he reported in a letter dated June 2, 1969 to D. H. Glowen, a Union Pacific traffic agent in New York. The letter stated that Miss Golden "hinted very firmly that Union Pacific is always at least 2nd to the Southern Pacific, because of SP purchases." (PX 224.)

William B. May testified that in 1961 his job as freight traffic agent was to sell transportation and that he regularly called on J. W. Peterson, traffic manager of Air Reduction Company, seeking business. May further testified that prior to dictating a letter dated August 14, 1961 to H. J. DeLacy, a representative of the traffic department of the Union Pacific in Los Angeles, he had a conversation with Peterson, in which Peterson told him what he reported in the letter. The letter stated:

"Your letter August 3 . . . concerning movements from the Air Reduction Co., Inc., Division Keokuk, Iowa to the Air Reduction Pacific Company at Huntington Park, California, served by the Union Pacific.

"General Traffic Manager Peterson of the Air Reduction Company, here, advises they are routing these cars via CB—SP which will give the SP their longest haul in reciprocation of purchases made by them which triple ours.

"However, he has promised to route a fair share of futures via UP to Ogden—SP." (PX 231.)

■ The testimony of Triplett and May and the related exhibits suggest

that the purchases of Southern Pacific Railroad from Airco may have been a factor in Airco's selection of the Southern Pacific over the Union Pacific in certain instances. However, this evidence is insufficient to support a finding that Airco and Southern Pacific entered into any contract, combination, or conspiracy, or otherwise engaged in any course of dealing involving reciprocal buying and that a not insubstantial amount of interstate commerce was affected.

Finally, the government introduced various documents obtained from Airco and other companies, some of which suggest that reciprocity may have been discussed in connection with prospective purchase and sales transactions between Airco and its customers and suppliers. (*See, e. g.*, PX 233, 234, 235.) However, even in those instances where the documents have been amplified by testimony, there remains insufficient evidence on which to base a finding that Airco entered into any contract, combination, or conspiracy, or otherwise engaged in any course of dealing with any of its suppliers involving reciprocal buying and that a not insubstantial amount of interstate commerce was affected.

Having considered all the evidence introduced as part of the government's direct case, the Court holds that the government has failed to show that Airco violated section 1 of the Sherman Act as charged in the complaint.

*Section 2 of the Sherman Act*

■ The complaint charges that Airco, "through the use of its purchasing power," violated section 2 of the Sherman Act "by attempting to monopolize that part of . . . interstate trade and commerce consisting of the requirements of actual and potential suppliers of the defendant for ferroalloys, industrial gases and other products sold by the defendant." However, the government has not introduced any evidence defining the relevant market, *see* Walker Process Equipment, Inc. v. Food Ma-

chinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Kreager v. General Electric Co., 497 F.2d 468 (2d Cir. 1974), and has not shown that Airco had intent to monopolize. *See* Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S. Ct. 181, 196 L.Ed. 162 (1951); Kreager v. General Electric Co., *supra.* Accordingly, the Court holds that the government has failed to show that Airco violated section 2 of the Sherman Act as charged in the complaint.

Airco's motion for a dismissal is granted.

The foregoing constitutes the Court's findings of fact and conclusions of law. F.R.Civ.P. 41(b), 52(a).

Settle judgment on notice.