**SOUTHERN CONCRETE COMPANY,**
**Plaintiff-Appellant,**

v.

**UNITED STATES STEEL CORPORA-**
**TION et al., Defendants-Appellees.**

**No. 75–2987.**

United States Court of Appeals,
Fifth Circuit.

July 19, 1976.

Rehearing and Rehearing En Banc
Denied Sept. 24, 1976.

John H. Boone, San Francisco, Cal., John V. Skinner, Jr., Earl B. Benson, Jr., A. Mims Wilkinson, Jr., Atlanta, Ga., for plaintiff-appellant.

Curtis L. Frisbie, Jr., Joseph R. Gladden, Jr., Charles H. Kirbo, Atlanta, Ga., for defendants-appellees.

Before GEWIN and AINSWORTH, Circuit Judges, and MARKEY *, Chief Judge.

GEWIN, Circuit Judge:

In this private antitrust suit Southern Concrete Company, plaintiff below, appeals from a partial grant of summary judgment in favor of defendant-appellee United States Steel Corporation. From the late 1950's until 1969 appellant Southern Concrete was engaged in the manufacture and sale of ready-mix concrete in the Atlanta metropolitan area; it is now defunct. Appellee United States Steel Corporation, through its Universal Atlas Cement Division (hereinafter United States Steel), is a supplier of cement, a major ingredient of ready-mix concrete, in the Atlanta area. In 1965 the principals of Williams Brothers Lumber Company, a building supplies business, decided to enter the expanding ready-mix concrete business in Atlanta. Upon learning this, United States Steel contacted Williams Brothers to solicit its business.

Thereafter, on three occasions from 1965 through 1967, an Atlanta bank, Trust Company of Georgia, loaned over $1.25 million to Williams Brothers on favorable terms; United States Steel agreed to serve as guarantor on each of Williams Brothers' three notes to the bank. These loan guarantees were secured by rights of first refusal to purchase the stock of Williams Brothers. These rights of first refusal remained in effect only while there were outstanding balances on the loans. Williams Brothers repaid each of the three loans, and United States Steel never acquired or purchased any Williams Brothers stock. In addition, on one occasion in 1969 United States Steel made a direct loan to Williams Brothers, which the latter repaid. Williams Brothers bought almost all of its cement requirements from United States Steel. Southern Concrete did not purchase any cement from United States Steel within the period here involved and never manufactured or sold cement in competition with United States Steel. Williams Brothers' cement business prospered and expanded; Southern Con-

* Of the U. S. Court of Customs and Patent Appeals, sitting by designation.

crete, on the other hand, went out of business in 1969.

In 1971 Southern Concrete instituted this antitrust action against both United States Steel and Williams Brothers[1], at whose feet Southern Concrete would lay the blame for its demise. The favorable financing which United States Steel had been able to arrange, Southern Concrete contended, had enabled Williams Brothers to undersell its competitors and force them out of business. The complaint set forth a plethora of alleged antitrust violations[2] by the two defendants including the following, the only claims involved in this appeal:

1. A tying arrangement violative of section 1 of the Sherman Act, 15 U.S.C. § 1. Southern Concrete alleged that United States Steel had granted loan guarantees (the alleged tying product) to Williams Brothers conditioned upon Williams Brothers' agreement to purchase cement (the alleged tied product).[3]

2. An exclusive dealing arrangement violative of section 3 of the Clayton Act, 15 U.S.C. § 14. Southern Concrete asserted that United States Steel had sold cement to Williams Brothers on the condition that Williams Brothers purchase all its cement requirements from United States Steel.

3. A reciprocal dealing arrangement violative of section 1 of the Sherman Act. Southern Concrete alleged that United States Steel had agreed to guarantee loans to Williams Brothers if the latter would agree to purchase cement.

4. A reciprocal dealing arrangement violative of section 1 of the Sherman Act. Southern Concrete alleged that United States Steel had agreed to provide Williams Brothers the services of one of its employees (a cement technician), if Williams Brothers would provide United States Steel with storage facilities.

After more than three years of discovery, United States Steel moved for partial summary judgment with respect to some of the claims asserted by Southern Concrete including, *inter alia*, the four aforementioned alleged violations of section 1 of the Sherman Act and section 3 of the Clayton Act. For purposes of this motion, and on this appeal, United States Steel assumes *arguendo* that the alleged violations had occurred; it argues, however, that Southern Concrete lacks standing under the provisions of section 4 of the Clayton Act to assert these four claims. The trial court agreed and granted the motion for partial summary judgment on these claims. The exhaustive opinion of the district court is reported at 394 F.Supp. 362 (N.D.Ga.1975). On the bulk of its claims, however, Southern Concrete had a jury trial. After a trial lasting approximately three weeks, the jury found in favor of United States Steel and

---

1. Southern Concrete settled its claim against Williams Brothers on March 28, 1975, and an order dismissing Williams Brothers was subsequently entered.

2. Discriminatory sales of cement to Williams Brothers; conspiracy to restrain trade in the production and sale of cement; conspiracy to restrain trade in the production and sale of ready-mix concrete; conspiracy to attempt to monopolize the production and sale of both cement and concrete in three separate geographic markets (the Atlanta area, the state of Georgia, and the southeastern United States), each constituting a distinct antitrust violation; conspiracy to monopolize production and sale of both cement and ready-mix concrete in the three market areas; attempt to monopolize the production and sale of both cement and ready- mix concrete in the three market areas; and an achieved monopoly in the production and sale of both cement and ready-mix concrete in the three market areas.

3. *See Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). In *Fortner* the Supreme Court found that the defendants, United States Steel and its wholly-owned subsidiary had engaged in an unlawful tying arrangement; the subsidiary had extended credit for purchasing land (the "tying product") on the condition that the steel company's prefabricated homes (the "tied product") be purchased for use on the land. *Fortner*, however, did not alter the requirements for standing to challenge an alleged tying agreement.

against Southern Concrete on every issue.[4] Southern Concrete has not appealed from the adverse jury findings. Rather, the only issue before us on this appeal is whether the court erred in granting United States Steel's motion for summary judgment on the four claims of reciprocal dealings, exclusive dealings, and a tying arrangement. We affirm.

■ Section 4 of the Clayton Act, 15 U.S.C. § 15 provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . .

Although the statute contains no language of limitation, the Supreme Court has recognized that

[t]he lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.

*Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263, 92 S.Ct. 885, 891, 31 L.Ed.2d 184, 193 n. 14 (1973) (citations omitted). To establish that he has been injured "by reason of" an antitrust violation within the meaning of section 4, the private antitrust plaintiff must show that he was within the "target area" of the alleged violation. That is, he must "show himself within the sector of economy in which the violation threatened a breakdown of competitive conditions."

*Jeffrey v. Southwestern Bell,* 518 F.2d 1129 (5th Cir. 1975); *Battle v. Liberty Nat'l Life Ins. Co.,* 493 F.2d 39, 49 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *Dailey v. Quality School Plan, Inc.,* 380 F.2d 484, 487 (5th Cir. 1967).

■ To determine whether a particular plaintiff meets the "target area" test for standing, it is necessary to examine the nature of the specific antitrust violations of which he complains and to ascertain what areas of the economy would be affected thereby. Southern Concrete alleged a tying agreement and reciprocal dealings violative of Section 1 of the Sherman Act, and exclusive dealings violative of Section 3 of the Clayton Act. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . ." *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 550 (1958). The evil inherent in an illegal tie-in "is the fact that the agreement or the effect thereof lessens competition in the tied product." *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52, 58 (4th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975). *See also Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277, 1293 (1953) ("The common core of the adjudicated unlawful tying arrangement is the forced purchase of a second distinct

---

4. The case was submitted to the jury by way of special interrogatories. The jury found:

1. That United States Steel did not engage in a contract, combination, or conspiracy to restrain interstate trade in violation of Section 1 of the Sherman Act;

2. That United States Steel *did not monopolize* the manufacture, sale, and distribution of *cement* in the Atlanta metropolitan area in violation of Section 2 of the Sherman Act;

3. That United States Steel *did not attempt to monopolize* the manufacture, sale, and distribution of *cement* in the Atlanta metropolitan area in violation of Section 2 of the Sherman Act;

4. That United States Steel *did not combine or conspire to monopolize* the manufacture, sale, and distribution of *cement* in the Atlanta metropolitan area in violation of Section 2 of the Sherman Act;

5. That United States Steel *did not monopolize* the manufacture, sale, and distribution of *ready-mix concrete* in the Atlanta metropolitan area in violation of Section 2 of the Sherman Act;

6. That United States Steel *did not attempt to monopolize* the manufacture, sale, and distribution of *ready-mix concrete* in the Atlanta metropolitan area in violation of Section 2 of the Sherman Act;

7. That United States Steel *did not conspire to monopolize* the manufacture, sale, and distribution of *ready-mix concrete* in the Atlanta metropolitan area in violation of Section 2 of the Sherman Act.

commodity with the desired purchase of a dominant 'tying' product, *resulting in economic harm to competition in the 'tied' market*.") (emphasis added); *Wendkos v. ABC Consol. Corp.*, 379 F.Supp. 15, 17 (E.D. Pa.1974). The anti-competitive effects of tying agreements are two-fold: "they may force [the party subject to the tie] into giving up the purchase of substitutes for the tied product, . . . and they may destroy the free access of competing suppliers of the tied product to the consuming market." *United States v. Loew's, Inc.*, 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11, 18 (1962). Consequently, the area of the economy threatened with a breakdown of competitive conditions because of a tying agreement is the market for the tied product; and those who will be proximately injured thereby—in addition to the party subject to the tie—are competitors in the tied product.

█ In the case before us the alleged "tied" product is cement, which Williams Brothers was purportedly forced to buy from United States Steel. Southern Concrete did not sell cement; it sold ready-mix concrete. Moreover, Southern Concrete did not purchase cement from United States Steel. Thus, even if there did exist a tying agreement obligating Williams Brothers to buy cement from United States Steel, it neither restricted the market for Southern Concrete's product, ready-mix concrete, nor confined Southern Concrete's sources of supply for cement.

In *Holleb & Co. v. Produce Terminal Cold Storage Co.*, 5 CCH Trade Reg. Rep. ¶ 60,-436 (N.D.Ill.1975), the court confronted an analogous situation. Holleb, a distributor of frozen foods, alleged that Produce Terminal, a competing distributor, had engaged in an illegal tying agreement by refusing to purchase the products of a frozen food producer that did not store its products in Produce Terminal's public frozen food warehouse facilities (the "tied product"). The court found no evidence of a tying agreement, but concluded that even if such an agreement did exist, "it would not be an agreement of which the plaintiff could complain. . . . Were plaintiff engaged in

the business of frozen food warehousing, it could complain of such an agreement, if it existed." *Id.* at 66,921. By the same token, had Southern Concrete been in the cement business and had the market for its product been restricted because a potential customer was required by a tying agreement to purchase all its cement requirements from a competitor, Southern Concrete might well have been injured "by reason of" the agreement within the meaning of Section 4; however, that simply is not the case.

█ This same type of analysis can be applied to the other types of antitrust violations alleged by Southern Concrete: reciprocal dealing and exclusive dealing. "Reciprocal dealing" generally involves the use of buying power to secure an advantage in the sale of one's products, *W. L. Gore & Assoc. v. Carlisle Corp.*, 381 F.Supp. 680, 702 (D.Del.1974), or an *inter se* agreement to purchase from each other between two parties who stand on equal footing with reference to purchasing power, *United States v. General Dynamics Corp.*, 258 F.Supp. 36, 59 (S.D.N.Y.1966). It has been identified by the Supreme Court as an anticompetitive practice. *FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 594, 85 S.Ct. 1220, 1221, 14 L.Ed.2d 95, 97 (1965). The evil attendant upon this practice is the foreclosure of markets to competitors through the use of purchasing power. *United States v. Airco, Inc.*, 386 F.Supp. 915, 917 (S.D.N.Y.1974). The first reciprocal dealing arrangement alleged by Southern Concrete involved Williams Brothers' purchase of cement in exchange for United States Steel's loan guarantees; the second involved Williams Brothers' providing the steel company with storage facilities in exchange for the services of a cement technician. Southern Concrete dealt in none of the goods or services subject to the alleged reciprocal dealing agreements. Consequently, even assuming the existence of such agreements, the market for no Southern Concrete products was affected as a result thereof, and Southern Concrete could not have suffered injury thereby.

Southern Concrete's claim of an exclusive dealing arrangement stands on no better footing. Under section 3 of the Clayton Act, 15 U.S.C. § 14, it is unlawful to require a purchaser not to deal with others as a condition of dealing with the seller. The obvious vice of such an arrangement is that it both restricts the purchaser from looking elsewhere for a more competitive source of supply and excludes the supplier's competitors from the purchaser's business. In this case Southern Concrete is neither the purchaser subject to this alleged arrangement nor a competitor of the supplier, United States Steel. "Standing to sue under § 3 of the Clayton Act has not been extended to those who are neither competitors of the alleged violating supplier nor themselves restricted purchasers." *Thomas v. Amerada Hess Corp.*, 393 F.Supp. 58, 76 (M.D.Pa.1975).

Lastly, throughout this proceeding Southern Concrete has failed to specify what injuries, if any, it suffered as a result of the violations alleged. As the court below recognized, instead of setting forth "specific facts" in compliance with F.R.C.P. 56(e), Southern Concrete chose to rely upon

> . . . general allegations of injury due to the alleged conspiracy between U.S.S. and Williams Brothers to restrain trade in and to monopolize the ready-mix concrete market [making] no attempt to specify injuries to it due to the alleged tying, exclusive dealing or reciprocal dealing arrangements.

394 F.Supp. at 370. Rather than coming forward with credible evidence to support its allegation of injury—the *sine qua non* for stating a cause of action by a private antitrust plaintiff, *Shumate & Co. v. National Ass'n of Sec. Dealers, Inc.*, 509 F.2d 147, 152 (5th Cir. 1975)—Southern Concrete chose to rely on the statement by the Supreme Court in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82

S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962), that summary disposition is not favored in antitrust cases. In *Poller* the Court was considering charges of conspiracy to restrain trade; such charges normally require proof of specific intent and necessitate trial. There is no such requirement of proof with regard to the alleged antitrust violations involved in this appeal. *Capital Temporaries, Inc. of Hartford v. Olsten Corp.*, 506 F.2d 658, 667 (2d Cir. 1974). Southern Concrete may not "bootstrap [its] hollow claim of an anticompetitive effect into a triable issue by relying on" *Poller*. *Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). Mere conclusory allegations of an antitrust violation will not suffice to defeat a motion for summary judgment. *Solomon v. Houston Corrugated Box Co., Inc.*, 526 F.2d 389 (5th Cir. 1976).[5]

AFFIRMED.

---

5. We feel it appropriate to state that this is not the usual summary judgment case. When the partial summary judgment was granted, there had been extensive discovery and the facts were well established, as will be seen by reference to the opinion of the district court.