Alfred H. **HARDWICK**, Plaintiff,

v.

**NU–WAY OIL CO. et al.**, Defendants.

Civ. A. No. 73–C–88.

United States District Court,
S. D. Texas,
Corpus Christi Division.

Feb. 1, 1978.

942

Bill Blackburn, Corpus Christi, Tex., for plaintiff.

Paul G. Kratzig of Kendrick & Kratzig, Corpus Christi, Tex., for defendants.

## MEMORANDUM OPINION

NOEL, District Judge.

Plaintiff brought this action under § 4 of the Clayton Act, 15 U.S.C. § 15, seeking treble damages for alleged violations of § 1 of the Sherman Act, 15 U.S.C. § 1. This action is before the Court on plaintiff's motion for partial summary judgment and defendants' cross-motion for summary judgment. Based on the depositions, answers to interrogatories and stipulations of fact, the Court concludes that there is no genuine issue as to any material fact, Fed. R.Civ.P. 56(c), and that summary judgment should be granted in favor of defendants.

The first amended complaint alleges that defendant, Nu-Way Oil Co., (Nu-Way), engaged in predatory retail price cutting which forced plaintiff out of business. Plaintiff asserts that the predatory price cutting was accomplished through an illegal price fixing agreement in violation of § 1 of the Sherman Act, entered into between Nu-Way and the operator of the Nu-Way service station.

Nu-Way, during the time involved in this action, supplied gasoline to approximately 100 self-service gasoline stations in Texas and Arkansas. Two related companies, which plaintiff alleges are co-conspirators, supplied gasoline to an additional 90 to 100 stations in Texas, Alabama and Mississippi. The gasoline was supplied on a consignment basis to the station operators with Nu-Way retaining the right to set the price of gasoline at the pump. Plaintiff was a Nu-Way station operator until he moved the location of his gasoline station and drive-in grocery store in 1971. Nu-Way declined to supply gasoline to plaintiff at his new location, so plaintiff began to buy his gasoline from another supplier. Plaintiff does not allege any damages caused by Nu-Way's refusal to continue to deal with him.

Plaintiff's theory of recovery is based on a novel joinder of a discriminatory price cutting allegation with a resale price fixing charge. After plaintiff opened his new gasoline station, his ex-wife, Marcelina Meza, obtained a supply contract from Nu-Way and re-opened the gasoline station at plaintiff's old location. For convenience, this old location will be referred to as the "Nu-Way station" and plaintiff's new station will be referred to as the "Hardwick station". The Nu-Way station and the Hardwick station were within one-half mile of each other, and plaintiff alleges that Nu-Way used its price fixing clause in its agreement with Meza to engage in discriminatory price cut-

ting. Plaintiff contends that he was forced to close his business one month after he opened his new station as a result of Nu-Way's predatory prices.

The complaint asserts that Nu-Way was in a position to engage in predatory retail price cutting because Nu-Way's numerous other outlets throughout Texas and Arkansas would allow Nu-Way to make up the profit lost through the price cutting at the one station. These allegations would appear to present a classic claim of discriminatory price cutting under § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a).[1] However, in the Fifth Circuit, the plaintiff must meet a very strict jurisdictional test to succeed on a Robinson-Patman claim. *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140 (5th Cir. 1973) (en banc). *Littlejohn* holds that at least one of the discriminatory sales must be made in interstate commerce for there to be jurisdiction under the Robinson-Patman Act. Plaintiff has not asserted a claim under the Robinson-Patman Act and the subsequent factual development in this case shows that plaintiff's claim would not meet the strict jurisdictional test of *Littlejohn*. It is clear that none of the alleged discriminatory sales occurred in interstate commerce so this Court would not have jurisdiction of a Robinson-Patman claim.

In order to circumvent the strict jurisdictional requirements of the Robinson-Patman Act, plaintiff has joined what are normally two independent federal antitrust torts into one claim. Plaintiff has alleged retail price fixing, which is a violation of § 1 of the Sherman Act, coupled with discriminatory price cutting which would be prohibited by § 2 of the Robinson-Patman Act. The price fixing allegation is neces-

sary to give the Court jurisdiction and the price cutting allegation is necessary to show damages. Plaintiff alleges no damages that were a direct result of the price fixing. He alleges that Nu-Way used its price fixing capability to engage in the predatory price cutting. Plaintiff's only damages resulted from the price cutting. The issue therefore presented is whether a plaintiff may use an alleged price fixing allegation under the Sherman Act which does not directly injure him to circumvent the jurisdictional requirements of the Robinson-Patman Act and recover damages for a classic Robinson-Patman price cutting claim.

Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizes treble damage relief and provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court . . and shall recover threefold the damages by him sustained . . . .

15 U.S.C. § 15.

A literal interpretation of this statute would indicate that a plaintiff, no matter how remotely injured by any antitrust violation, could bring an antitrust action; however, courts have taken a more restricted view. For plaintiff to be able to bring this action, he must have standing to sue on the price fixing claim. To have standing under § 4 of the Clayton Act, a plaintiff must have suffered an injury of the type the antitrust laws were intended to prevent. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). *Donovan Const. Co. v. Florida Tel. Corp.*, 564 F.2d 1191 (5th Cir.

1. Title 15 U.S.C. § 13a provides in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to be a party to, or assist in, any transaction of sale, or contract to sell, which discriminates to his knowledge against competitors of the purchaser, in that, any discount, rebate, allowance, or advertising service charge is granted to the purchaser over and above any discount, rebate, allowance, or advertising service charge available at the

time of such transaction to said competitors in respect of a sale of goods of like grade, quality, and quantity; to sell, or contract to sell, goods in any part of the United States at prices lower than those exacted by said person elsewhere in the United States for the purpose of destroying competition, or eliminating a competitor in such part of the United States; or, to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.

1977). The Fifth Circuit has adopted the "target area" test to determine whether a plaintiff's injury is sufficient to confer standing. *Donovan Const. Co. v. Florida Tel. Corp., supra; Southern Concrete Co. v. U. S. Steel Corp.*, 535 F.2d 313 (5th Cir. 1976); *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172 (5th Cir. 1976); *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir. 1975).

■ The "target area" test arose as a means of limiting the class of potential plaintiffs to those persons who could most adequately vindicate the purposes of the antitrust laws. Although the ripple effects of an antitrust violation may be felt throughout various levels of the economy, the "target area" test ensures against potentially disastrous recoveries by those only tenuously hurt. *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975).

■ To establish standing, the private antitrust plaintiff must show that he was within the "target area" of the alleged violation. To determine whether a particular plaintiff meets the "target area" test, it is necessary to examine the nature of the specific antitrust violation of which he complains and to ascertain what areas of the economy would be affected thereby. *Southern Concrete Co. v. U. S. Steel Corp.*, 535 F.2d 313, 316 (5th Cir. 1976). In *Yoder Bros. v. California-Florida Plant Corp.*, 537 F.2d 1347 (5th Cir. 1976), the Court adopted a two-step approach for focusing on the affected area of the economy. First, the affected area of the economy must be identified. Second, the court must determine whether the claimed injury occurred within that area. *Yoder Bros. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1360 (5th Cir. 1976) (citing *In Re Multidistrict Vehicle Air Pollution M.D.L. No., 31*, 481 F.2d 122, 129 (9th Cir. 1973), *cert. denied Morgan v. Automobile Mfgrs. Assn.,*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336).

Turning to the first inquiry, what area of the economy is threatened by the alleged price fixing of defendants? It is the retail sale of gasoline to the public. The complaint alleges that Nu-Way entered into an agreement with the operators of the Nu-Way stations whereby Nu-Way retained the right to set the retail price of the gasoline sold through the Nu-Way station. But by fixing the retail price of gasoline, Nu-Way would also be removing any variation in prices between the various Nu-Way station operators. Thus the alleged price fixing also threatens to eliminate competition between the Nu-Way station operators. Therefore, the area of the economy threatened by the alleged price fixing is both the retail sales to the public and competition between Nu-Way station operators.

■ It is clear that plaintiff's claimed injury did not occur within this area of the economy. The alleged injury was not suffered by plaintiff as a public customer (or a governmental entity suing on behalf of the public) nor was he a Nu-Way station operator at the time of his alleged injury. Plaintiff was in competition with the Nu-Way station operators and the alleged price fixing agreement did not hamper his ability or restrict his freedom to compete with the Nu-Way stations. The price fixing agreement, if in fact it was one, would only interfere with the Nu-Way station operators' ability to compete. Thus, plaintiff does not have standing to sue under § 4 of the Clayton Act for an alleged price fixing claim.

Even assuming that plaintiff did have standing to bring a price fixing claim and therefore could combine a price fixing claim and a predatory price cutting claim, the defendants would be entitled to summary judgment in their favor since the facts show that there was no illegal price fixing in this case. Plaintiff relies principally on *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), which held that the antitrust laws prevent the use of a consignment device to fix prices in many retail outlets of a vast gasoline distribution system. Nu-Way supplies gasoline to its station operators on a consignment basis and plaintiff asserts that Nu-Way's consignment agreement is invalid under *Simpson*.

Defendants argue that *Simpson* only invalidates consignment agreements covering "vast" distribution systems and that their system of retail outlets is not "vast". Even adding the retail outlets of the related companies, there were only approximately 200 retail outlets over four states in Nu-Way's (and the related companies') distribution system. In magnitude, this is not to be compared with Union Oil's system of over 4,000 retail outlets over eight states, *Simpson v. Union Oil Co., supra*, at n.1, 15, 84 S.Ct. 1051. *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir. 1972), emphasized that a business practice attacked as a violation of § 1 of the Sherman Act by a single intrastate dealer must be broadly utilized over a large distribution system so as to have a substantial effect on interstate commerce. Nu-way's distribution system does not approach the magnitude of Gulf Oil's system and therefore there may be some merit in defendants' argument. However, it is not necessary to reach the question of whether Nu-Way's distribution system is vast enough for *Simpson* to apply, since the consignment device used by Nu-Way is not illegal under *Simpson.*

With respect to the Nu-Way station involved in this case, Nu-Way entered into an agreement with the lessee (and later the owner) of the land where a drive-in grocery was located. This location later became the Nu-Way station. Nu-Way acquired the right to install and did install at its sole cost, at this location, gasoline pumps, tanks and electronic consoles necessary for the operation of a self-service gasoline station. The station operator received a fixed sum of $225 monthly from Nu-Way which was later changed to a fixed sum of $75, plus a commission of one cent per gallon of gasoline sold.[2] Nu-Way paid the station operator monthly by a company check.

The agreement between Nu-Way and the operator of the Nu-Way station recites that Nu-Way remained the owner of the gasoline until it was sold and actually delivered to the customer, and that the operator held the gasoline only as a "consignee" of Nu-Way. The contract also provides that the operator is an independent contractor and that nothing in the agreement should be construed to create a partnership, joint venture or employment relationship between the parties.

Nu-Way supplied all of the gasoline to the station and retained all risk of loss of the gasoline until it was pumped through the gasoline pumps. The gasoline pumps had meters on them which recorded the total volume of gasoline and the total amount of sales that passed through the pump. The station operator read these meters on a daily basis and from this determined the total dollar volume of the gasoline sales for that day. The station operator deposited the money from the gasoline sales in a Nu-Way bank account. Thus, all income from gasoline sales went directly to Nu-Way. A Nu-Way supervisor would visit the station every other week, read the gasoline pump meters, and verify that the correct amount had been deposited in Nu-Way's bank account. The station operator had to account for all sales as recorded on the gasoline pump meters; however, he was not responsible for any loss of gasoline before it passed through and was recorded by the meters. For example, if there was a leak in one of the underground tanks, the station operator would not be responsible for the lost gasoline; the risk of loss was on Nu-Way.

Nu-Way retained all ownership of the gasoline sales equipment, and maintained and repaired this equipment at its cost. Nu-Way acquired and maintained all necessary permits and licenses required by law for the gasoline sales operation. Nu-Way paid all taxes applicable to the gasoline sales and all personal property taxes on the gasoline sales equipment.

The station operator had no responsibilities with respect to the sale of gasoline

---

**2.** After Meza took over the Nu-Way station, she received a fixed sum of $325 monthly with no commission.

other than to collect the money from the customer. The customer would drive to the pumps, fill his vehicle with gasoline and then go into the grocery store and pay the operator. No services such as checking batteries, oil, or tires or cleaning windshields were provided by the station operator. The price of the gasoline was set by Nu-Way and the price of the gasoline was changed solely at Nu-Way's instruction.

The consignment device invalidated in *Simpson* bears little resemblance to the consignment involved in this case. In *Simpson*, the station operator was responsible for all losses of the consigned gasoline. The return to the station operator was affected by the rise and fall in the market price of the gasoline as his commission declined as the retail price dropped. The dealers under the Union Oil consignment system possessed most of the indicia of independent businessmen who were in reality small independent competitors. The operators of the Nu-Way stations on the other hand have no independence with regard to the gasoline sales. They are independent businessmen with respect to their grocery store operations, but not with respect to the gasoline sales. The operator receives a fixed sum from Nu-Way regardless of the retail price of the gasoline. Nu-Way bears all risk of loss of the gasoline, controls the manner of selling the gasoline through its self-service equipment, and establishes and controls the price of the gasoline. In effect, the operator leases a location to Nu-Way and provides a part-time cashier for Nu-Way.

The facts show that instead of being a sham consignment as in *Simpson* where the operator was basically purchasing the gasoline from Union Oil, the consignment device here was a true consignment whereby Nu-Way was marketing its gasoline directly to the public. Nu-Way was not acting as a wholesale distributor to the station operators and the station operators were not "purchasing" the gasoline from Nu-Way. Rather, Nu-Way was making retail sales through its various outlets. Since a retailer can set his prices, there was no illegal price fixing and thus no violation of § 1 of the Sherman Act.

For the above reasons, defendants are entitled to have summary judgment entered in their favor. A Final Judgment granting summary judgment in favor of defendants shall be entered this date.