**LAFAYETTE STEEL COMPANY, a Michigan Corporation, Plaintiff,**

v.

**NATIONAL STEEL CORPORATION, a Delaware Corporation,**

and

**Kasle Steel Company, a Michigan Corporation, Defendants.**

Civ. No. 74–72013.

United States District Court, E. D. Michigan, S. D.

July 23, 1980.

Richard A. Solomon, Sally Lee Foley, D. Michael Kratchman, Evans & Luptak, Detroit, Mich., for plaintiff.

Herbert G. Sparrow, III, Dickinson, Wright, McKean, Cudlip & Moon, Detroit, Mich., for National Steel.

William H. Yager, Butzel, Levin, Winston & Quint, Detroit, Mich., for Kasle Steel.

## OPINION ON MOTION FOR SUMMARY JUDGMENT

COHN, District Judge.

Before the Court is a motion by defendant Kasle Steel Company (Kasle) for summary judgment on the sole ground that plaintiff Lafayette Steel Company (Lafayette) alleges as an antitrust violation a conspiracy to fix prices in the sale of first operation blanks[1] while it claims damages in the sale of brokered steel[2] citing *Brunswick Corporation v. Pueblo Bowl-O-Mat Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) as authority. Kasle says that Lafayette in effect claims damages in different markets and under *Brunswick* may not do so.

Lafayette answers by saying that the antitrust wrong complained of was a price-fixing conspiracy between National Steel Corporation (National) and Kasle coupled with a refusal to sell by National at a time when steel was in short supply citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) as authority, and that the Court must distinguish between the fact of injury or the impact upon plaintiff of defendants' conduct and the amount of plaintiff's damage citing 15 Von Kalinowski, Antitrust Laws and Trade Regulation § 115.03[1]:

> "There is no established formula for the computation of damages in an antitrust action. Each case presents a particular problem as to the cause of plaintiff's monetary losses. There are, however, two general rules to bear in mind. First, as indicated earlier, it is essential to distinguish, in private antitrust cases, between the *fact* of damage and the *amount* of damage. They are mutually exclusive concepts and are subject to different burdens of proof. The *fact* of damage relates to the litigants' standing to sue. The plaintiff must prove with 'reasonable certainty' that injury has occurred. On the other hand, uncertainty as to the *extent* or *amount* of damages will not bar recovery." (emphasis in original)

Lafayette asserts it can prove that its loss of profit on brokered steel flowed directly from the complained of wrongful conduct.

Kasle responds by saying that for Lafayette to claim loss of profit on brokered steel it must show that any illegal agreement between Kasle and National restrained an appreciable amount of steel made by steel mills and available to companies like Lafayette for sale to others.

█ The Court does not agree. Assuming the fact of injury by the wrongdoing, which must be admitted for the purpose of Kasle's motion, any provable loss directly

---

1. First operation blanks are shapes stamped from a sheet or coil of steel and formed for part of a car or other kind of equipment. Lafayette bought steel from National Steel Corporation, processed it into blanks and sold them to the automobile industry, principally General Motors Corporation.

2. Brokered steel is steel, generally sheet or coil, purchased, warehoused and then resold. Lafayette bought steel from National Steel Corporation, warehoused it and then resold it to a variety of customers. Lafayette had no long term commitments for steel from National.

resulting may be claimed as damage. Lafayette's claim is as if Lafayette included in its computation of loss of profit on the blanking business its losses on the sale of scrap generated by the processing of coil or sheet steel into blanks.[3]

## I.

### A.

Lafayette's initial complaint was filed in July, 1974 against National. It alleged violations of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 2 and 18.

In August, 1975 Lafayette filed an amended complaint adding Kasle as a defendant as to the existing claims and also adding a count alleging violation by National of Section 2(e) of the Robinson–Patman Act, 15 U.S.C. § 13(e).

All of the claims but one were subsequently abandoned by Lafayette. The only claim now before the Court is grounded on Section 1 of the Sherman Act, 15 U.S.C. § 1:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

### B.

Lafayette is a wholesaler of steel and a processor of steel products. Prior to 1973 it purchased steel from a number of mills, foreign and domestic, some of which steel it warehoused and resold without processing and some of which steel it processed before

reselling. One of the steel products it processed was first blanks. Ninety–five percent of its production of first blanks was sold to the Fisher Body Division of General Motors Corporation. National is a steel producer. One of its customers was Lafayette. It in turn was one of Lafayette's principal sources of steel. Kasle's business is similar to Lafayette's. Kasle began processing first blanks in mid–1973.

### C.

Lafayette's case can be described as follows:[4]

Lafayette sold first blanks to the Fisher Body Division at "mill book" or list price for the coil or sheet steel from which the blanks were processed. Lafayette was able to sell at list, even though it incurred additional expense in processing, because it purchased steel from National at a 15% discount from the list price.[5]

National regularly tried to get Lafayette to raise its prices on first blanks. In 1972 National undertook a study concerning the possibility of getting into the first blank business itself. As part of the study there were extensive discussions between Lafayette and National looking to the purchase by National of Lafayette's business.

National knew it could not go into the first blank business as long as Lafayette was selling first blanks at list price. National decided to terminate Lafayette in late 1972 as a customer in anticipation of a steel shortage so that Lafayette could not find an alternate source of supply. By this means Lafayette would be eliminated as a competitor in first blanks.

---

**3.** The motion for summary judgment and its supporting brief were filed August 22, 1979. There have been some sixteen to eighteen briefs, letters and reports filed by the parties since that time. The Court heard oral argument on April 11, 1980 and reargument on June 18, 1980. More than half the filings followed a letter from the Court on March 17, 1980 asking a number of questions only some of which now appear relevant to the issues raised by the motion.

**4.** The description of Lafayette's case including the description of its damage study is taken

from status reports and other filings by Lafayette.

**5.** There was some confusion in the Court's mind initially whether the discount by National related only to steel sold for first blanks or on all steel purchased by Lafayette. It appears that the discount covered all steel purchased. The Court is still uncertain whether National simply eliminated the discount and Lafayette decided not to buy from National or whether National in fact refused to sell steel to Lafayette in 1973–1974.

At about the same time National and Kasle got together and entered into an agreement [6] under which National guaranteed loans to Kasle and guaranteed a source of steel supply to Kasle so Kasle could go into the first blank business using National's steel. Lafayette, as a consequence of the National–Kasle agreement, was forced out of the first blank business since it could not obtain an alternative source of supply.[7]

Lafayette describes its theory of damages as follows:

"During the period 1973 and 1974, a period of acute shortage of steel in the United States, LAFAYETTE was not able to go out and cover its steel supply position, and LAFAYETTE was deprived by the cutoff on the part of Defendant NATIONAL of its then–current level of supply plus the 1973 and 1974 increments in supply volume that Defendant NATIONAL was giving to other customers in the area. The value of this lost steel supply, which Plaintiff contends it was deprived of pursuant to a combination and conspiracy between Defendants NATIONAL and KASLE to raise the price at which first operation blanks were sold to General Motors and others, is the measure of Plaintiff's damages.

Plaintiff . . . proceed(s) under Section 1 of the Sherman Act on the grounds that Defendant NATIONAL's termination of supply to Plaintiff was pursuant to that combination and conspiracy to fix prices on the sale of first operation blanks between Defendant NATIONAL and Defendant KASLE, a price–fixing conspiracy which could not have worked had LAFAYETTE been around continuing to sell at its traditional pricing levels. Plaintiff's damage study has taken substantially in excess of a year to complete and is now essentially complete and will be turned over to Defendants within ten days."

## D.

The damage study [8] was done by Lafayette to determine and support its claim for money damages for the years 1973 and 1974. It is predicated on the assumption that National would have continued to supply steel to Lafayette generally in the same quantities and for the same prices it did in prior years. It appropriately adjusts these variables for 1973 and 1974 proportionate to what it says were changes in price and quantities in National sales to others during these years.

Lafayette then determined what its gross revenues would have been and subtracted the estimated cost of doing business attributed to these revenues to arrive at the net profit it would have made had the National supply been available. Four different cases are set forth in the study based on assumptions as to level of purchases and the proportion between steel brokered and steel processed exclusive of first blanks.

In each of the four cases according to Lafayette the proportion of steel which would have been processed into first blanks is backed out and plays no part in the

---

**6.** The agreement between National and Kasle is dated December 22, 1972. It provided, among other things, for National to supply Kasle with steel to be processed by Kasle into blanks and spells out in detail the way blanks are to be priced for sale to General Motors Corporation should General Motors Corporation purchase blanks. Under the agreement National retained substantial control over the way blanks were to be sold and priced to General Motors Corporation. The extent to which the agreement violates Section 1 of the Sherman Act and is, therefore, a per se violation is not before the Court. For purposes of Kasle's motion, the Court assumes it constitutes price–fixing.

**7.** Lafayette's allegations are hotly disputed by National and Kasle. For purposes of Kasle's motion the Court accepts as true the allegation that National cut Lafayette off at a time steel was in short supply so it could go into business with Kasle and so that Kasle could sell first blanks at higher prices than Lafayette had been charging.

**8.** Lafayette's damage study will obviously be the subject of some considerable dispute at trial and Lafayette's inability to support it with competent evidence could well be fatal to its case whatever the antitrust wrong it proves. See *Volasco Products Company v. Lloyd A. Fry Roofing Company*, 308 F.2d 383, 392 (6th Cir. 1962).

determination of lost profits. This is so according to Lafayette "because of data and experience reference gaps Lafayette cannot prove the amount of its damages in blanking."[9]

In papers filed with the Court, particularly following the oral argument of April 11, 1980, there is much discussion of whether the first blank business contributed anything to Lafayette's profit in 1972 and prior years or whether in fact Lafayette lost money on this business. If a finding that Lafayette lost money on the blanking business is necessary to the success of Kasle's motion or a finding that Lafayette made money on the blanking business precludes summary judgment, then obviously the Court must deny the motion. This is an issue incapable of resolution on summary judgment.

In summary then, Lafayette claims as damages the profit it would have made by re–selling the steel it would have purchased from National in the years 1973 and 1974 but for being cut–off, exclusive of the amount of steel purchased from National which would have gone into first blanks during those years.

## II.

Summary judgment is not unknown to antitrust cases in this circuit, *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (6th Cir. 1963), *cert. den.* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), *reh. den.* 375 U.S. 982, 84 S.Ct. 479, 11 L.Ed.2d 428 (1964); *Daily Press, Inc. v. United Press International*, 412 F.2d 126 (6th Cir. 1969), *cert. den.* 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); *Granader v. Public Bank*, 417 F.2d 75 (6th Cir. 1969), *cert. den.* 397 U.S. 1065, 90 S.Ct. 1503, 25 L.Ed.2d 686 (1970). However, "the granting of summary judgments in antitrust litigation is disfavored. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)." *Ware v. Trailer Mart, Inc.*, 623 F.2d 1150 at 1154 (6th Cir. 1980).

If there are substantial issues meriting trial the Court may not grant judgment and the evidence must be construed in favor of the party opposing the motion and against the moving party. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962). Additionally, it is not the role of the Court to credit or discredit testimony or evaluate credibility. *Willetts v. Ford Motor Co.*, 583 F.2d 852, 855 (6th Cir. 1978).

The burden is on Kasle to establish the absence of a genuine issue while Lafayette has the opportunity to set forth specific facts showing that there is a genuine issue for trial. *Smith v. Hudson*, 600 F.2d 60 (6th Cir. 1979). When the evidence is incomplete or disputed the matter should not be disposed of summarily, but instead should be left to determination by the trier of fact.

If the Court is satisfied, given the undisputed nature of Lafayette's claim for damages, i. e., for loss of profit on brokered steel, that Kasle is correct in its contention that Lafayette may not allege an antitrust violation in the market for first blanks and claim as damages loss of profit on the sale of brokered steel, then summary judgment is appropriate.

On the other hand if Lafayette is correct in its contention that damages outside the relevant market may be recovered so long as these damages are directly caused by the antitrust wrong which is the subject of the complaint, summary judgment is inappropriate. Put another way, summary judgment is inappropriate if Lafayette is entitled to all provable direct damages flowing from the wrongful conduct of Kasle regardless of the source of such damages.

## III.

### A.

One of the points of apparent confusion is the nature of Lafayette's claim of wrongdo-

---

**9.** The "data and experience reference gaps" refer to the inability of Lafayette to determine how much blanking business Lafayette would have done in 1973 and 1974. While not relevant to the disposition of the summary judg-

ment motion the Court has some difficulty squaring this "gap" with the ability of Lafayette to make projections of purchases and prices and sales of brokered steel for purposes of computing its loss of profits for these years.

ing, described in *Brunswick, supra,* 429 U.S. at 490, 97 S.Ct. at 698 as the predatory act. Lafayette argues that the antitrust wrong it suffered is the cut–off of the steel supply from National as part of the agreement with Kasle to fix prices in first blanks at a time of short supply. It cites in support of its position *Klors, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3rd Cir. 1979); *Burton Supply Co., Inc. v. Wheel Horse Products, Inc.,* 1974–2 CCH Trade Cases ¶ 75,224 (N.D.Ohio, 1974); and *Ohio–Sealy Mattress Manufacturing Company v. Sealy, Incorporated,* 585 F.2d 821 (7th Cir. 1978).

Kasle in turn argues that these cases are not applicable and that the sole purpose of the National–Kasle arrangement was to fix prices in the sale of first blanks and therefore Lafayette cannot claim damages for loss of profit in brokered steel citing such cases as *Brunswick, supra; Outboard Marine Corp. v. Pezetel, et al,* 461 F.Supp. 384 (D.Del.1978); and *Hardwick v. Nu–Way Oil Co.,* 443 F.Supp. 940 (S.D.Tex.1978).

### B.

In *Klors, supra,* a retail appliance dealer sought damages from competing retailers as well as manufacturers and distributors of various appliances for conspiracy to refuse to sell to it or to sell to it only on unfavorable terms. Notwithstanding the fact that there were numerous other appliance dealers in the area from whom consumers could purchase the very same appliances Klors claimed were denied it, the Supreme Court held that the complaint stated a cause of action; that the concerted refusal to deal interfered with the natural flow of commerce and, therefore, was not to be tolerated. Computation of damages was not involved.

*Cernuto, supra,* was a suit by a distributor against a manufacturer and a competing distributor alleging that the manufacturer terminated the distributor at the behest of the competitor for price cutting. The lower court held for the defendant saying the manufacturer exercised an independent judgment in his choice of distributors and since no other manufacturer joined there was no true boycott or per se violation. On appeal, the decision was reversed with the Court of Appeals holding that a combination which tampered with price structures would interfere with the free play of the market forces in violation of Section 1 of the Sherman Act. It went on to say that a deliberate withdrawal by the manufacturer from one who sold for less than his competitor at the behest of the competitor might well be a violation of Section 1.

*Burton Supply, supra,* held wrongful the use of coercive measures to maintain a pricing policy; the coercive measure was a cut–off of the distributor.

Kasle's attempt to distinguish these cases by citation to *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969); *Ark Dental Supply Company v. Cavitron Corporation,* 461 F.2d 1093 (3rd Cir. 1972); *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843 (6th Cir. 1979); and *Oreck Corporation v. Whirlpool Corporation,* 579 F.2d 126 (2nd Cir. 1978), is not persuasive. Each of these cases held that the conduct of the alleged offender was essentially unilateral and that there was no resultant anti–competitive effect; the manufacturer could unilaterally determine to charge without running afoul of the antitrust laws. *Oreck* in particular points out the plaintiff's failure to present evidence that the net economic effect of non–renewal of its contract was to restrain trade unreasonably or that alternative sources of supply were unavailable and, therefore, it was excluded from competition.

■ Here we have allegations of joint action by alleged competitors to eliminate competition and as a consequence of which supply was lost. This is certainly "sufficient to entitle [Lafayette] to go to trial . . . ." *Klors, supra,* 359 U.S. at 214, 79 S.Ct. at 710 (concurring opinion of Harlan, J.).

## C.

Kasle goes on, however, and argues that given the premise that price–fixing in the sale of first blanks is the antitrust violation complained of *Brunswick, supra*, precludes Lafayette from claiming as damages loss of profit on brokered steel.

Kasle says that the injury (loss of the first blank business caused by price fixing conspiracy) must be logically related [10] to the damages claimed (loss of profit on the first blank business) and since they are unrelated in Lafayette's formulation of damages Lafayette may not recover. To support this argument Kasle emphasizes two passages from *Brunswick* :

> "Plaintiffs must prove *antitrust* injury which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.' *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. at 125, 89 S.Ct. at 1577.
>
> While they produced some conclusory testimony suggesting that in operating the acquired centers petitioner had abused its deep pocket by engaging in anticompetitive conduct, they made no attempt to prove that they had lost any income as a result of such predation."

429 U.S. at 489–490, 97 S.Ct. at 697 (footnotes omitted).

In *Brunswick* defendant acquired a number of failing bowling alleys which plaintiff claimed violated Section 7 of the Clayton Act. Plaintiff argued that as a consequence it lost profits because of the unlawful acquisition; that if the acquired alleys closed it would have made more money. The Supreme Court rejected the line of reasoning holding that there was no connection between the recovery sought (loss of profits) and the purposes of the antitrust laws (making unlawful the substantial lessening of competition or tendency to create a monopoly). Plaintiff it said could not seek damages (loss of profits) caused by fair competition; this would have perverted the antitrust laws.

*Outboard Marine, supra*, and *Hardwick, supra*, follow the same reasoning.

In *Outboard Marine* the alleged offender imported golf carts at below market prices and allocated sales territories among its own dealers. According to plaintiff, a manufacturer of golf carts, this attracted the best dealers because they had no fear of competition and thereby damaged the plaintiff's business. Citing *Brunswick* the District Court denied the claim holding that only an intra–brand competitor could challenge the wrongful conduct. What was happening, the District Court said, was that the alleged offender had become a more vigorous challenger in the inter–brand market. This was not the kind of activity, even though plaintiff was damaged by it, that the antitrust laws were designed to compensate for.

*Hardwick, supra*, was to the same general effect. There a distributor of gasoline fixed prices among its retailers. Plaintiff, a gasoline retailer, claimed that allowed his retail competitor to cut prices forcing him out of business. The District Court on the authority of *Brunswick* said that the price–fixing was directed against customers of the distributors' retailers and not plaintiff; therefore, plaintiff could not sue since he was not within the "target area" and at best had been damaged by the "ripple effect" only, 443 F.Supp. at 944.

Again these cases, in the Court's judgment, simply do not involve the kind of activity complained of by Lafayette; the

---

**10.** "[H]e must also show that his injury is logically related to the violation." *L & H Investments, Ltd. v. Belvey Corp.*, 444 F.Supp. 1321, 1324 (W.D.N.C.1978). The Court finds considerable confusion in the use of "injury" and "damage." They are often used interchangeably. See the discussion in *Zenith Radio Corporation v. Hazeltine Research, Inc.*, 395 U.S. 100 at 125, 89 S.Ct. 1562 at 1577, 23 L.Ed.2d 129 (1969) and the cases cited in footnote 14 in *Brunswick, supra*, 429 U.S. at 489, 97 S.Ct. at 698.

National/Kasle agreement which forms the foundation of Lafayette's claim and out of which the cut–off of steel flowed, was, for purposes of the motion for summary judgment, joint action directed against Lafayette and action which injured Lafayette.

### D.

Lafayette takes a different view of *Brunswick.* It suggests that the principle of *Brunswick* is that there must be a linking of the wrong and the injury in a very direct fashion such as a showing of predation or targeting in against the plaintiff by the defendant.

Lafayette's reliance on *Ohio–Sealy Mattress Manufacturing Company v. Sealy, Incorporated,* 585 F.2d 821 (7th. Cir. 1978), in explanation of *Brunswick* is well placed. Analysis of *Ohio–Sealy* supports the legitimacy of Lafayette's damage theory for purpose of this motion.

The differences between Ohio–Sealy and Sealy were of long standing. Sealy owned the trade name "Sealy"; Ohio–Sealy was one of its licensees and apparently one of its shareholders. In 1967 the United States Supreme Court held invalid a system of exclusive manufacturing and sales territories among Sealy licensees. *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). Thereafter it was Ohio–Sealy's claim that Sealy devised a new system of market exclusivity using a variety of devices. Ohio–Sealy challenged Sealy and ultimately obtained a jury's verdict in its favor.

One of the devices challenged, and upon which a jury gave Ohio–Sealy a substantial award, was Sealy's purchase of a number of licensees in territories in which Ohio–Sealy was interested. Sealy accomplished the purchase through the exercise of a first right of refusal which had been coupled with the grant of license. Sealy argued on the authority of *Brunswick* that there was no antitrust injury and no antitrust damage because the competitive situation would have been the same regardless of whether the prior licensee, Ohio–Sealy or Sealy, had primary responsibility for the territories in question. 585 F.2d at 832.

The 7th Circuit rejected this argument, finding that there was evidence of an illegal scheme to divide markets intentionally effectuated against Ohio–Sealy by means of the acquisitions, and then saying:

"We believe the profits lost thereby do reflect injury of a type the antitrust laws were intended to prevent and do flow directly from the anticompetitive scheme that made Sealy's acquisitions illegal. Obviously, to the degree the profits Ohio would have made might include profits that a poor interbrand competitor committed to avoiding intrabrand competition could also have made, they do not totally reflect an actual harm to market competition. But as the Court made clear in *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam), private antitrust suits need not be premised on actual diminutions in market competition, so long as they involve anticompetitive conduct aimed at the plaintiff. The refinement made in *Brunswick* is simply that the injury claimed 'should, in short, be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S., at 125, 89 S.Ct. 1562 at 1577.' 429 U.S. at 489, 97 S.Ct. at 697 (footnote omitted). That test is amply met here."

585 F.2d at 833.

### E.

Lastly, Lafayette lays strong emphasis on *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Berkey Photo Inc., v. Eastman Kodak Co.,* 603 F.2d 263 (2nd Cir. 1979); and *Yoder Bros., Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347 (5th Cir. 1976), in support of its position that all damages directly flowing from the antitrust violation are compensable. These cases are a mixed blessing to Lafayette. The Court

is of an uncertain mind as to whether they enhance or detract from Lafayette's position. What they say simply is that the quantum of proof required to show the amount of damage is less than the quantum of proof necessary to show the fact of damage. *Story Parchment,* citing as authority two early Michigan cases, *Allison v. Chandler,* 11 Mich. 542 (1863) and *Gilbert v. Kennedy,* 22 Mich. 117 (1871), holds that the risk of the uncertainty of a damage computation should be on the wrongdoer rather than the injured party. Given the uncertainties in Lafayette's damage study, referred to several times in this opinion, the standard required by these cases for a finding that an injury occurred in fact could well be fatal to Lafayette's case. Even allowing for the latitude they seem to indicate in the proofs for the amount of damages, Lafayette still faces an uncertain future at trial (see footnotes 8 and 9 *supra*).

### IV.

In summary then, Lafayette's case may be stated as follows:

A. There was a conspiracy by National and Kasle to fix prices which violated Section 1 of the Sherman Act. To implement the conspiracy there was a cut–off of steel supply by one of them to Lafayette.

B. There was a causal connection between the loss of profits Lafayette suffered, i. e., loss of profit on the sale of brokered steel, steel which could not be sold because of the cut–off of supply, and the antitrust violation.[11]

C. There is a connection between the recovery sought by Lafayette (loss of profit on the sale of brokered steel) and the purposes of the antitrust laws (prohibition of price fixing). If there had been no price fixing there would have been no cut–off of steel supply.

While the type of loss that a price–fixing conspiracy in first blanks would likely cause would be a loss of profits in the sale of first blanks as shown by acceptable accounting standards, there obviously could be additional losses attendant upon a cut–off of steel at a time of short supply.

On the record now before the Court, Kasle has not demonstrated that the claimed loss of Lafayette's steel supply incident to the price–fixing conspiracy it is alleged to have been a party to, could not have been a direct cause of Lafayette's loss of profit on brokered steel and is not the kind of loss to be expected under the circumstances.

The Court accepts as a fundamental that the monetary damages claimed by Lafayette should represent the monetary equivalent of the anti–competitive harm caused by the alleged conspiracy. *GAF Corporation v. Circle Floor, Inc.,* 463 F.2d 752, 757 (2nd Cir. 1972).

Certainly if Lafayette's damages were predicated on the loss of profit on the scrap generated in the processing of blanks there would be no question such loss would be a proper element of damages. The Court sees no essential difference between claiming the value of the scrap as an element of damages and claiming that the portion of the lost and irreplaceable steel supply which would have been brokered as an element of damages.

### V.

This case has been before the Court for a considerable time. While the essential facts giving rise to the allegations of the com-

---

11. "The connecting link between the injury to Lafayette and the antitrust violation attributed to Defendants National Steel and Kasle Steel is that National and Kasle deemed it necessary to interdict Lafayette from access to flat–rolled steel supply in order to prevent Lafayette from being able to process any of that flat–rolled steel into first operation blanks which Lafayette would then be able to sell to General Motors and other automotive companies in competition with the National/Kasle combine.

To the extent that Lafayette had flat–rolled steel in reliable supply, Lafayette could bid on opportunities to supply these companies with first operation blanks, and keep the National/Kasle combine from getting the prices they intended to get for their first operation blanks." *Answer of Lafayette to Question 4 of the Court* in its letter of March 17, 1980 *"How does Lafayette connect this antitrust violation to its damages?"*

plaint have not changed, it is obvious from the changing nature of Lafayette's charges of wrongdoing it has had some considerable difficulty in refining its theory of damages. Undoubtedly the fact that by admission Lafayette's first blank business was never profitable, and therefore, claiming damages for its loss would yield a modest award at best, *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934 (5th Cir. 1975), or would present difficult problems of proof, *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383 (6th Cir. 1962), Lafayette developed the theory of damages now before the Court. Whether it developed the theory before or after the decision in *Brunswick* is not clear. While *Brunswick* may seem to impose a barrier to Lafayette, it makes little sense to say that Lafayette cannot claim as damages the profit on the loss of the steel supply where it is asserted that (i) National and Kasle got together to freeze Lafayette out of the first blank business so they could sell first blanks at a higher price to Lafayette's former customers and (ii) National cut–off Lafayette's steel supply at a time of short supply to implement the scheme. Whatever the difficulties of proof Lafayette may encounter at trial, nonetheless on the record now before the Court measured solely against the single ground asserted by Kasle as the basis for its right to summary judgment, Lafayette is entitled to that opportunity. The motion is DENIED.